UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDWARD SMYTH and GAIL SMYTH )
    Plaintiffs, )
         )
         )
      v. )
         )  C.A. No. 14-13472-MLW
AMERICA'S SERVICING COMPANY, a )
division of WELLS FARGO BANK, )
N.A., et al. )
    Defendants. )

ORDER

WOLF, D.J.                           March 30, 2017

On July 22, 2014, Edward and Gail Smyth filed this action in the Plymouth Superior Court for the Commonwealth of Massachusetts alleging that defendants engaged in unfair and deceptive conduct in connection with the Smyth's attempts to modify their mortgage loan pursuant to the Home Affordable Modification Program ("HAMP"). In particular, the Smyths allege that in 2010, defendants misrepresented their eligibility for a HAMP modification and deceived them into accepting an unaffordable "in-house" modification instead. The Smyths also allege that between 2011 and 2013, after they defaulted on their 2010 loan, defendants deceived them into spending a year and a half applying for a second modification to avoid foreclosure, even though defendants knew that investor restrictions on the loan prohibited a second modification and that the application was futile.

The Smyths claimed violations of Mass. Gen. Laws Chapter 93A (Count I), lack of standing to foreclose (Count II), breach of fiduciary duty (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), and misrepresentation (Counts V and VI). Defendants subsequently removed the case to this court. The case was referred to Magistrate Judge Judith Dein for full pretrial purposes, including a report and recommendation on any dispositive motions. See Docket No. 26. On July 1, 2016, defendants moved for summary judgment. See Docket No. 38.

The Magistrate Judge issued her Report and Recommendation on March 1, 2017. See Docket No. 60. In it, she concludes that defendants are entitled to judgment as a matter of law on counts II, III, and IV because defendants have standing to foreclose, and did not breach any fiduciary duty or implied covenant. In addition, she concludes that plaintiffs' claims in counts I, V, and VI are time-barred to the extent that they arise from the 2010 mortgage loan. However, she also concludes that a reasonable jury could find that defendants' actions concerning the second loan modification constituted common-law misrepresentation and violated Chapter 93A. Accordingly, she recommends that the defendants' motion be allowed as to counts II, III, and IV and denied as to counts I, V, and VI to the extent that she did not recommend that they be found to be time-barred.

2

The time period for objections to the Report and Recommendation has expired. No objections have been filed. In any event, the court has reviewed the Magistrate Judge's reasoning and finds it to be thorough, thoughtful, and persuasive. Therefore, the Report and Recommendation is being adopted.

In view of the foregoing, it is hereby ORDERED that:

1.    The Magistrate Judge's Report and Recommendation (Docket No. 60) is ADOPTED and INCORPORATED pursuant to 28 U.S.C. §636.

2.    For the reasons stated in the Report and Recommendation, the defendants' Motion to for Summary Judgment (Docket No. 38) is ALLOWED with respect to Counts II, III, and IV, alleging lack of standing to foreclose, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. The motion is DENIED with respect to Counts I, V, and VI, alleging violations of Mass. Gen. Laws Chapter 93A and common-law misrepresentation, to the extent that the Magistrate Judge did not recommend that they be found to be time-barred.

3.    The parties shall, by April 12, 2017, report whether they consent to trial before the Magistrate Judge.


_____
UNITED STATES DISTRICT JUDGE

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDWARD SMYTH and GAIL SMYTH,          )
                                      )
          Plaintiffs,                 )
      v.                              )          CIVIL ACTION
                                      )          NO. 14-13472-MLW
AMERICA'S SERVICING COMPANY, a        )
division of WELLS FARGO BANK, N.A.,   )
et al.,                               )
                                      )
          Defendants.                 )

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

March 1, 2017

DEIN, U.S.M.J.

### I. INTRODUCTION

The plaintiffs, Edward and Gail Smyth (the "Smyths"), are the owners of a home located
in Middleboro, Massachusetts. They have brought this action against America's Servicing
Company, a division of Wells Fargo Bank, N.A.; Wells Fargo Home Mortgage, Inc. (referred to
collectively with America's Servicing Company as "Wells Fargo"); and U.S. Bank, N.A., as Trustee
for Residential Asset-Backed Pass-Through Certificates Series 2006-EMX1 ("U.S. Bank"),[1]
claiming that the defendants engaged in unfair, deceptive and otherwise unlawful conduct in
connection with the Smyths' efforts to modify their mortgage loan pursuant to the Home

---

[1] The Smyths also named Ocwen Loan Servicing, LLC ("Ocwen") as a defendant in this action. However,
on September 23, 2014, the Smyths voluntarily dismissed all of their claims against Ocwen. (Docket No.
8).

Affordable Modification Program ("HAMP") and avoid a foreclosure on their property.  In particular, the Smyths allege that the defendants acted unlawfully by misrepresenting their eligibility for a favorable HAMP modification in early 2010, and deceiving them into accepting an unaffordable, "proprietary" modification instead.  They further allege that after it became clear that they were unable to meet their payment obligations under the terms of the proprietary modification, the defendants again acted improperly by inducing the Smyths to apply for a second modification and then, after a year and a half application process, denying their application on the grounds that the first modification rendered them ineligible for relief under HAMP.  By their Complaint, the plaintiffs have asserted claims against the defendants for violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A") (Count I), lack of standing to foreclose (Count II), breach of fiduciary duty (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), intentional misrepresentation (Count V) and negligent misrepresentation (Count VI).

The matter is before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 38), by which the defendants are seeking summary judgment, pursuant to Fed. R. Civ. P. 56, on all of the plaintiffs' claims.  As detailed below, this court finds that the defendants are entitled to judgment as a matter of law on the Smyths' claims for lack of standing to foreclose, breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing, but that disputed issues of material fact preclude summary judgment on the claims for misrepresentation and violations of Chapter 93A.  Therefore, and for all the reasons set forth herein, this court recommends to the District Judge to whom this case is assigned that the defendants' motion for summary judgment be ALLOWED IN PART and DENIED IN PART.

## II. STATEMENT OF FACTS[2]

The following facts, which are relevant to the defendants' motion for summary judgment, are undisputed unless otherwise indicated.[3]

### The Parties

The plaintiff, Edward Smyth, is a real estate appraiser. (DF ¶ 17). During the time period relevant to this litigation, he operated his own real estate business. (DF ¶ 18). Mr. Smyth's wife, plaintiff Gail Smyth, is a jewelry artist. (DF ¶ 21). Although Mrs. Smyth has a history of employment as a medical technician, she has not worked outside the home since about 1991, when she was physically assaulted at work and developed serious anxiety. (DF ¶¶ 22-24; Def. Ex. C at 12-15). The plaintiffs are owners of a home located in Middleboro, Massachusetts. (See Def. Ex. E). This case concerns the Smyths' efforts to obtain a mortgage loan modification under HAMP, and to save their home from foreclosure.

Defendant Wells Fargo is authorized, pursuant to a power of attorney, to conduct business with respect to loans held by U.S. Bank. (DF ¶ 16). At all times relevant to this

---

[2] Unless otherwise indicated, the facts are derived from the following materials: (1) the Statement of Material Facts in Support of Defendants' Motion for Summary Judgment ("DF") and the exhibits attached thereto ("Def. Ex. __") (Docket No. 40); (2) the Plaintiffs' Statement of Material Facts in Support of Their Opposition to the Motion for Summary Judgment ("PF") and the exhibits attached thereto ("Pl. Ex. __"), which are attached to the Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Docket No. 46); and (3) the Defendants Wells Fargo Bank, N.A. and U.S. Bank N.A. as Trustee's Response to Plaintiffs' Statement of Material Facts ("DR") (Docket No. 52).

[3] As described in a separate Memorandum of Decision and Order on Defendants' Motion to Strike issued on this date, this court has stricken paragraphs 6, 7 and 10 of the Affidavit of Edward Smyth. Accordingly, this court has not incorporated that testimony into its Statement of Facts, and has not credited any alleged facts that are based on that testimony. In addition, this court has not credited any facts contained in the parties' Statements of Material Facts that are not supported by citations to the evidentiary record. See Local Rule 56.1 (explaining that motions for summary judgment and oppositions to such motions "shall include a concise statement of the material facts ... with page references to affidavits, depositions and other documentation").

litigation, Wells Fargo has been the servicer of the plaintiffs' mortgage loan. (DF ¶ 15).  It also

has served as the document custodian for defendant U.S. Bank. (Id.).

### The Smyths' Mortgage Loan

On November 4, 2005, the plaintiffs entered into an adjustable rate mortgage loan

transaction with Mortgage Lender's Network U.S.A., Inc. ("MLN") by executing a promissory

note ("Note") in the amount of $260,000. (DF ¶ 1; Def. Ex. A).  MLN indorsed the Note to EMAX

Financial Group, LLC ("EMAX"), which specially indorsed the Note to Residential Funding

Corporation. (DF ¶¶ 2-3; PF ¶¶ 26, 28; DR ¶ 28).  Residential Funding then indorsed the Note

to "U.S. Bank National Association as Trustee WITHOUT RECOURSE."  (DF ¶ 4; Def. Ex. A at Page

7 of 7).  Wells Fargo, as custodian for U.S. Bank, acquired the Note on December 29, 2005. (DF

¶ 7; Def. Ex. D at 2).

The Note was secured by a Mortgage on the Smyths' home in Middleboro. (See Def. Ex.

E).  Mortgage Electronic Registration Systems, Inc. ("MERS"),[4] acting as a nominee for the

lender and the lender's successors and assigns, was named as the mortgagee of record. (Id. at

---

[4] "[T]he MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages.  Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages.  Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.  The initial MERS mortgage is recorded in the County Clerk's office with 'Mortgage Electronic Registration Systems, Inc.' named as the lender's nominee or mortgagee of record on the instrument.  During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system.  In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage."  MERSCORP, Inc. v. Romaine, 8 N.Y.3d 90, 96, 828 N.Y.S.2d 266, 268, 861 N.E.2d 81, 83 (2006) (footnotes omitted).

1; DF ¶ 9). Pursuant to the Mortgage, MERS had the right to invoke the statutory power of sale. (DF ¶ 10). However, nothing in the Mortgage required the mortgagee to modify or to consider modifying the mortgage loan. (DF ¶ 11).

### The 2010 Mortgage Loan Modification

Wells Fargo began servicing the plaintiffs' Mortgage in about March 2007. (Def. Ex. D at 3). That same year, the Smyths defaulted on their loan. (DF ¶ 25). In an effort to be proactive and save their home from foreclosure, the Smyths applied to Wells Fargo for loss mitigation when they were still less than three months in arrears. (Pl. Ex. C ¶ 2). Upon receipt of the completed application, Wells Fargo evaluated the plaintiffs for a loan modification. (See PF ¶ 1; Pl. Ex. A at 5). As part of its evaluation, the defendant ran the Smyths' information through the so-called "waterfall" test, which requires a loan servicer to apply a series of steps aimed at reducing monthly mortgage payments to 31 percent of the homeowners' gross monthly income.[5] (See id.). In January 2010, Wells Fargo approved the plaintiffs for a permanent loan modification, which met the criteria of the waterfall test. (PF ¶ 1).

At the time the Smyths applied for the loan modification, Wells Fargo was a partici-pating servicer under the HAMP program. (PF ¶ 2). However, it is unclear whether the parties discussed that program at the time the Smyths submitted their application. According to Wells Fargo, none of its records indicate that the parties discussed HAMP or that the plaintiffs' were seeking a HAMP modification. (See Pl. Ex. A at 2-3). On the other hand, Mr. Smyth claims that

---

[5] The waterfall method requires servicers to perform the following steps: "(1) capitalize accrued interest and escrow advances to third parties; (2) reduce the annual interest rate to as low as 2 percent; (3) extend the term up to 40 years and reamortize the loan; and (4) if necessary, forbear repayment of principal until the loan is paid off and waive interest on the deferred amount." Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 557 n.1 (7th Cir. 2012).

at or around the time he was submitting his application for a modification, he spoke to a Wells

Fargo employee who told him that all of the available modifications were HAMP modifications.

(Def. Ex. B at 46-47). In any event, there is no dispute that the modification Wells Fargo offered

the Smyths was an in-house, proprietary modification rather than a HAMP loan. (See PF ¶ 37;

DR ¶ 37).

The Smyths accepted the defendant's offer, and on January 12, 2010, the parties

entered into a written Loan Modification Agreement. (DF ¶ 30; Def. Ex. K). It is undisputed that

the Smyths reviewed the terms of the Loan Modification Agreement prior to signing it, and

understood that it altered the terms of their mortgage loan. (DF ¶¶ 28-29). As detailed in the

Agreement, the modification converted the plaintiffs' loan from an adjustable rate loan to a

fixed rate loan, and capitalized the outstanding arrearages. (See Def. Ex. K). However, the Loan

Modification Agreement contained no mention of HAMP, and did not purport to modify the

loan pursuant to the federal HAMP program. (See id.).

Despite the lack of any reference to HAMP in the Loan Modification Agreement, the

Smyths claim that they did not realize that the 2010 modification was not a HAMP modification

until they consulted with counsel in 2013. (PF ¶ 37; Pl. Ex. C ¶ 5). They also claim that they

were eligible for a HAMP modification in 2010, and that a HAMP loan would have been more

favorable than the in-house modification they received from Wells Fargo. (See PF ¶¶ 18-21,

43-44). As described below, this court finds that the Smyths' claims relating to the 2010 loan

modification are time-barred.[6] In any event, there is no dispute that the Smyths voluntarily

---

[6] In its Memorandum of Decision and Order on Defendants' Motion to Strike, this court allowed the
defendants' motion to strike portions of the Affidavit of Edward Smyth in which Mr. Smyth described his
use of an online calculator to determine that he would have been eligible for a HAMP modification in

entered into the Loan Modification Agreement with Wells Fargo, and accepted the terms contained therein. (See DF ¶¶ 28-30).

On August 3, 2011, MERS, "as Nominee for Mortgage Lenders Network USA, Inc., its Successors and Assigns," assigned the plaintiffs' Mortgage to defendant "U.S. Bank, National Association, as Trustee for RASC 2006-EMX1." (DF ¶ 12; PF ¶ 25; DR ¶ 25). Thus, according to the record on summary judgment, the defendants held both the Mortgage on the plaintiffs' home and the underlying promissory Note as of August 2011. (See DF ¶¶ 7, 12). As described below, the plaintiffs are attempting to dispute U.S. Bank's status as the holder of the Note and the Mortgage, but this court finds that they have failed to create a genuine question of fact on this issue.

### Plaintiffs' Application for a Second Loan Modification

After receiving the 2010 modification, the Smyths continued to struggle to pay their mortgage loan. (DF ¶ 31). On September 29, 2010, they filed for Chapter 7 bankruptcy protection. (DF ¶ 32; Def. Ex. L). In their bankruptcy petition, the plaintiffs listed the current value of their real property as $239,000, and the amount of their mortgage debt as $263,526.52. (DF ¶ 33; Def. Ex. M at Page 13 of 41). On December 29, 2010, the Smyths received a discharge from the Bankruptcy Court. (DF ¶ 35). While this relieved the Smyths from any personal liability on the discharged debt, it did not alter the mortgagee's rights in the

---

2010, and relied on his own calculations to determine what his monthly mortgage payments allegedly would have been if he had been approved for a modification under the HAMP program. Consequently, even if the court were to address the plaintiffs' claims regarding the 2010 loan modification on the merits, there is no admissible evidence in the record to support the Smyths' claim that they would have qualified for a HAMP loan in 2010, or that Wells Fargo was required to provide them with a HAMP modification at that time.

property, including the right to pursue foreclosure. See Best v. Nationstar Mortg., LLC, 540 B.R. 1, 9 (1st Cir. BAP 2015) ("Fundamentally, a discharge merely releases a debtor from personal liability on the discharged debt; when a creditor holds a mortgage lien or other interest to secure the debt, the creditor's rights in collateral, such as foreclosure rights, survive or pass through the bankruptcy." (quotations and citation omitted)).

The Smyths remained unable to make their mortgage payments, and by the spring of 2011, they had defaulted on their modified mortgage loan. (See DF ¶ 36; Pl. Ex. C ¶ 14). Following the default, Wells Fargo sent them correspondence encouraging them to apply for another loan modification, and promising to review them for a modification based on the information they submitted. (PF ¶ 6; DR ¶ 6; Pl. Ex. C ¶ 14). In 2011, the Smyths submitted an application for a second loan modification from Wells Fargo. (DF ¶ 37). They also engaged Neighborhood Assistance Corporation of America ("NACA") to work with the defendant on their behalf. (DF ¶ 38; Def. Ex. B at 22). The record establishes that the Smyths engaged in a lengthy process to obtain a new loan modification from Wells Fargo. It also establishes that their efforts were futile from the outset because investor restrictions on the loan did not allow for a second modification.

Between 2011 and 2013, the Smyths, either individually or through NACA, remained in frequent contact with Wells Fargo in an effort to obtain another loan modification. (PF ¶ 5; DR ¶ 5). According to Mr. Smyth, the process involved significant time and effort on his part because it required him to respond to repeated requests for paperwork, send numerous facsimiles and handle a substantial volume of email correspondence. (See PF ¶ 7; DR ¶ 7). He also contends that throughout the process, Wells Fargo continued to assure him that he and his

8

wife would be reviewed for a loan modification based upon the information he submitted, and that they would receive a modification if they qualified. (PF ¶¶ 6, 33 Pl. Ex. C ¶ 22).

As part of the discovery in this litigation, Wells Fargo produced internal records reflecting its handling of the Smyths' application for a second loan modification. Those records contain notes from June 24, 2011, which read in relevant part as follows:

> OVER 100.00% OF MORTGAGE PAYMENT.  BASED ON INV/BUS RULES,
> LOAN CANNOT BE CONSIDERED FOR OTHER OPTIONS IN ER.  UNABLE TO
> RECOMMEND CREDIT COUNSELOR.

(Pl. Ex. R). Based on this evidence, the plaintiffs contend that the defendants knew, as of June 2011, that investor restrictions on their mortgage loan would preclude Wells Fargo from offering them a second modification, and that it was unfair and deceptive to encourage the Smyths to continue to pursue a modification under those circumstances. (Pl. Opp. Mem. (Docket No. 46) at 15). The defendants dispute this interpretation, and insist that the note refers to restrictions on Wells Fargo's ability to offer the plaintiffs a repayment plan, "which allows the borrower to catch up on delinquent payments under the existing loan," but has nothing to do with a modification, "which results in entirely new loan terms." (DR ¶ 46 (quoting Doyle v. CitiMortgage, Inc., 32 Mass. L. Rptr. 312, 2014 WL 4373558, at *7 (Mass. Super. Ct. Aug. 11, 2014)). Accordingly, the defendants argue that the note "does not indicate that the loan was [not] eligible for a loan modification due to investor restrictions." (DR ¶ 46). For the reasons described below, this court finds that this evidence raises a disputed issue of fact that should be resolved at trial.

Wells Fargo performed a review of the Smyths' completed application on January 18, 2013. (PF ¶ 9). The review included assessments for eligibility under HAMP, and indicated that

the Smyths passed the HAMP "Tier 2 – NPV Test." (PF ¶¶ 10, 15; Pl. Ex. E at Bates No. 312).[7]

An NPV, or "Net Present Value" test is performed after the servicer determines that the

borrower's mortgage meets certain criteria for eligibility under HAMP, and it "determines

whether or not the loan modification would be an economically efficient and desirable

transaction." Regal v. Wells Fargo Bank, N.A., --- F. Supp. 3d ---, 2016 WL 4699679, at *4 (D.

Mass. Sept. 7, 2016). In this case, Wells Fargo's evaluation indicated that the Smyths could

qualify for an NPV positive HAMP modification with a term of 276 months, an interest rate of

4.00%, and a monthly principal and interest payment of $1,177.59. (PF ¶ 16; Pl. Ex. E at Bates

No. 315). Nevertheless, on February 6, 2013, Wells Fargo notified the plaintiffs that they did

"not meet the investor requirements" of the available mortgage assistance program because

they had "exceeded the number of modifications allowed by the investor." (Pl. Ex. D). Thus,

after a year and a half of work by the parties to avoid a foreclosure on the Smyths' property,

---

[7] The defendants have objected to the plaintiffs' reliance on bank records describing Wells Fargo's evaluation of the Smyths' loan modification application in January 2013. The defendants argue that the documents are not admissible on summary judgment because they have not been properly authenticated, and because they constitute hearsay. (See DR ¶¶ 10, 15-16). However, the defendants have not moved to strike those documents from the record, and have not objected to the plaintiffs' reliance on those same documents to show that Wells Fargo performed a review of the Smyths' application on January 18, 2013. (See DR ¶ 9). Furthermore, it is clear from the documents that they were produced by Wells Fargo during the course of the litigation, that they consist of records that were created in connection with the defendant's evaluation of the plaintiffs' loan modification application, and that they were kept in the regular course of Wells Fargo's business. See United States v. Cameron, 699 F.3d 621, 641 (1st Cir. 2012) (finding that documents met the business record exception to the hearsay rule where "(1) they were made at or near the time of the event; (2) kept in the regular course of business; and (3) created in the regular course of business"). Therefore, the defendants' assertion that the documents are not authentic, and that they fall outside the scope of the business record exception to the hearsay rule, is unpersuasive. This court will consider those records in connection with the motion for summary judgment. However, nothing herein shall be construed as a determination as to whether the documents should be admitted into evidence at trial.

the defendants informed the plaintiffs that their 2010 loan modification disqualified them from obtaining any additional relief.

On or about March 5, 2013, the Smyths received a letter from Wells Fargo's outside counsel. (Pl. Ex. L). The letter informed the plaintiffs that their mortgage loan was in default, that Wells Fargo had accelerated the loan and that Wells Fargo had instructed counsel to initiate foreclosure proceedings. (Id.). In connection with their present action, the Smyths are seeking to establish that the defendants lack standing to foreclose on their property because they are not the rightful holders of the Mortgage or the underlying promissory Note. For the reasons detailed below, this court finds that the defendants are entitled to judgment as a matter of law on that issue.

On July 9, 2013, Wells Fargo responded to an inquiry regarding the Smyths' mortgage loan. (Pl. Ex. B). In its letter, the defendant provided a more detailed explanation for the decision to deny the Smyths' application for a second loan modification. Specifically, as Wells Fargo explained:

> [Wells Fargo] services its mortgage loans on behalf of secondary market investors. All workout arrangements are based on a review of the homeowner's financial information and the investor's guidelines. [Wells Fargo] must comply with the home preservation standards of the investor prior to offering any type of workout arrangement to our mortgagors.

(Id. at 1). It further stated in relevant part:

> Through a review completed on February 06, 2013, it was determined that neither a loan modification under the federal government's Home Affordable Modification Program (HAMP) or non-HAMP options could be approved as the investor of the loan only allows capitalization of arrearages into the unpaid principal balance once through the life of the loan. Since the arrearages were capitalized through the above Agreement, a second loan modification is unable to be completed....

> Additionally, the investor of the loan only allows assistance through principal reduction when the loan to value ratio (LTV) is greater than 115%. At the time of the review, the LTV was determined as 99.2%.
>
> As the loan is unable to be modified a second time due to the above investor restrictions, your financial situation and the proposed modification terms were irrelevant in the denial.

(Id. at 2). Accordingly, the investor restrictions were determinative of the decision to deny the application for a loan modification. There is no evidence that Wells Fargo requested a waiver of the restrictions on the Smyths' ability to obtain a second modification. (See Pl. Ex. H ¶ 5; Def. Ex. D ¶¶ 7-8).

On February 12, 2014, U.S. Bank, "as Trustee for RASC 2006-EMX1," assigned the Smyths' Mortgage to "U.S. Bank National Association, as Trustee, for Residential Asset Securities Corporation, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EMX1." (Def. Ex. G). Thus, the record indicates that U.S. Bank continues to hold the plaintiffs' Mortgage.

Additional factual details relevant to this court's analysis are set forth below where appropriate.

### III. ANALYSIS

#### A.    Summary Judgment Standard of Review

Wells Fargo and U.S. Bank have moved for summary judgment with respect to all of the Smyths' claims against them. "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citations omitted). The burden is upon the moving

party to show, based upon the discovery and disclosure materials on file, and any affidavits,

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be

resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)

(quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is 'material' only if it

possesses the capacity to sway the outcome of the litigation under the applicable law." Id.

(quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving

party to set forth specific facts showing that there is a genuine, triable issue." PC Interiors, Ltd.,

794 F. Supp. 2d at 275. The opposing party can avoid summary judgment only by providing

properly supported evidence of disputed material facts. LeBlanc v. Great Am. Ins. Co., 6 F.3d

836, 841-42 (1st Cir. 1993). Accordingly, "the nonmoving party 'may not rest upon mere

allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a

genuine issue for trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct.

2505, 2514, 91 L. Ed. 2d 202 (1986)). "The Court must view the entire record in the light most

hospitable to the non-moving party and indulge all reasonable inferences in that party's favor."

PC Interiors, Ltd., 794 F. Supp. 2d at 275. "Summary judgment is appropriate if, after viewing

the record in the non-moving party's favor, the Court determines that no genuine issue of

material fact exists and the moving party is entitled to judgment as a matter of law." Id.

**B.**     **Defendants' Authority to Foreclose on the Mortgage**

The defendants first contend that they are entitled to summary judgment on the

Smyths' claim, set forth in Count II of the Complaint, that U.S. Bank, as Trustee, lacks authority

13

to foreclose on their property because it has not shown that it is the valid holder of the plaintiffs' Mortgage and the underlying promissory Note. In order to have authority to foreclose on a mortgage under Massachusetts law, the foreclosing entity must "hold[ ] the mortgage and also either hold[ ] the mortgage note or act[ ] on behalf of the note holder." Eaton v. Fed. Nat'l Mortg. Ass'n, 462 Mass. 569, 571, 969 N.E.2d 1118, 1121 (2012) (footnote omitted). Because the undisputed facts establish that U.S. Bank or its custodian, Wells Fargo, holds both the Smyths' Mortgage and the Note, the defendants are entitled to judgment as a matter of law on this claim.

The record demonstrates that the Smyths executed the Note as part of their mortgage loan transaction with MLN. (DF ¶ 1). MLN then indorsed the Note to EMAX, which in turn indorsed the Note to Residential Funding Corporation. (DF ¶¶ 2-3; PF ¶¶ 26, 28; DR ¶ 28). The record further demonstrates that Residential Funding Corporation indorsed the Note to U.S. Bank as Trustee, and that Wells Fargo, as custodian for U.S. Bank, acquired the Note on December 29, 2005. (Def. Ex. A at Page 7 of 7; Def. Ex. D ¶ 2). The defendants have produced copies of the Note, along with the relevant indorsements, in support of their motion for summary judgment. (Def. Ex. A).

With respect to the Mortgage, it is undisputed that on August 3, 2011, MERS, as nominee for the lender and the lender's successors and assigns, assigned the plaintiffs' Mortgage to U.S. Bank, as Trustee for RASC 2006-EMX1, and that on February 12, 2014, U.S. Bank, as Trustee for RASC 2006-EMX1, assigned the Mortgage to U.S. Bank, "as Trustee, for Residential Asset Securities Corporation, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EMX1." (Def. Exs. F & G). The defendants have produced copies of the

14

Mortgage, the 2011 assignment and the 2014 assignment as exhibits to their motion.  (Def. Exs.

E, F & G).  Therefore, the record shows that the defendants hold both the Mortgage and the

Note.

### Plaintiffs' Challenge to U.S. Bank's Status as Holder of the Note

The plaintiffs attempt to raise an issue of fact as to whether U.S. Bank, as Trustee for

Residential Asset-Backed Pass-Through Certificates Series 2006-EMX1, is the holder of the Note

by pointing to a document, which the plaintiffs have described as a "MERS Milestone Report."

(See Pl. Ex. Q).  Although there is no testimony explaining the significance of the document or

its contents, it appears to be an excerpt from a report that was generated by MERS and

contains information relating to the transfer of servicing and beneficial rights in the plaintiffs'

mortgage loan.  (See id.).  The document lists the "Servicer" on the loan as a "Non-MERS

Member," the "Custodian" of the loan as "Wells Fargo Mortgage Document Custody," and the

"Investor" as an "Undisclosed Investor."  (PF ¶ 45; Pl. Ex. Q).  There is no indication that the

information contained in the document is accurate or reliable.  See Galvin v. EMC Corp., 50 F.

Supp. 3d 70, 76 (D.N.H. 2014) (noting that "MERS makes no representations or warranties

regarding the accuracy or reliability of its records" (punctuation omitted)).  Nevertheless,

according to the Smyths, the Report

> indicates [that] as of September 8, 2011 the loan was transferred to an
> "unidentified investor."  Assuming *arguendo* that the report is valid and
> accurate, it shows that as of at least in September 2011 the trust with the
> investor restriction [that resulted in the denial of their application for a
> HAMP modification] did not hold the note.

(Pl. Opp. Mem. at 13 (internal quotations and citation omitted)).

The defendants have objected to the admissibility of the Report on the grounds that it is hearsay. (DR ¶ 45). They further argue that the document is not material in any event because an "investor" is distinct from the holder of the Note. (Id.). This court finds that the MERS Milestone Report constitutes inadmissible hearsay, and that even if it were admissible, it would not raise a genuine issue of fact that would warrant the denial of the defendants' motion for summary judgment on this issue.

"It is black-letter law that hearsay evidence cannot be considered on summary judgment." Davila v. Corporacion de P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007). Where, as here, a party is attempting to rely on the contents of a document to prove the truth of the matters asserted therein, the document constitutes hearsay. See Fed. R. Evid. 801(c) (defining "Hearsay" to mean "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"). Moreover, the Smyths have not attempted to show that Milestone Report falls within an exception to the hearsay rule. See Galvin, 50 F. Supp.3d at 76 (finding that MERS Milestone Report "is hearsay that would not seem to fall into any exemption or exception set forth in Federal Rules of Evidence 801, 803, and 804," and "does not bear the 'circumstantial guarantees of trustworthiness' that would permit its admission into evidence under Rule 807's residual exception"). "This court may not consider such inadmissible material" in connection with its ruling on the motion for summary judgment. Id.

Even if the Milestone Report were admissible, it does not show, as the plaintiffs contend, that U.S. Bank no longer held the Note as of September 8, 2011. The Report indicates that as of that date, the loan had been transferred to "Non-MERS Status." (Pl. Ex. Q). However,

it does not purport to identify the name of the entity that held the Note at that time.  (See id.).

To the extent the MERS Milestone Report refers to an "Undisclosed Investor," there is nothing

in the Report equating the "Investor" with the beneficial owner of the Smyths' mortgage loan.

(See id.).  Generally speaking, where mortgages have been pooled together and deposited in a

trust, "the Trustee becomes the legal owner and holder of the relevant Notes" for the benefit

of "investors" who purchase interests in the trust in the form of mortgage-backed securities.

Rajamin v. Deutsche Bank Nat'l Trust Co., No. 10 Civ. 7531 (LTS), 2012 WL 1036075, at *2

(S.D.N.Y. Mar. 28, 2012).  This court cannot draw any conclusions about the identity of the Note

holder from the reference to an "Undisclosed Investor."  For this reason as well, the MERS

Milestone Report is insufficient to undermine the evidence of U.S. Bank's status as the holder of

the Smyths' promissory Note.  See Anderson, 477 U.S. at 249-50, 106 C. Ct. at 2511 (explaining

that evidence which "is merely colorable, or is not significantly probative," is not sufficient to

defeat a motion for summary judgment (internal citation omitted)).

     The plaintiffs' reliance on a document entitled "SCRA-DMDC Eligibility Search" is like

wise insufficient to create a disputed issue of material fact.  The document appears to

reflect the results of a search by Wells Fargo to determine whether the Smyths were subject to

the protections of the Servicemembers Civil Relief Act ("SCRA").  (See Pl. Ex. S;

https://www.servicememberscivilreliefact.com).  As in the case of the MERS Milestone Report,

the defendants have objected to the document as hearsay, and the plaintiffs have not estab-

lished, or even attempted to establish, that the document falls within an exception to the

hearsay rule.  (See PF 47; DR ¶ 47).  Accordingly, they have not shown that it is admissible for

purposes of summary judgment.  Furthermore, while the document identifies the "Investor

Name" on the Smyths' loan as "RFC/GMAC SUB RFC S/S #B11," it does not purport to identify the holder of the Note. (See Pl. Ex. S). In the absence of any testimony addressing the relevance of the SCRA-DMDC Eligibility Search document and the information contained therein, it is not possible to draw any reasonable inferences from it regarding the owner of the Smyths' mortgage loan.

The Smyths also argue that the defendants lack authority to foreclose on the Mortgage because Residential Funding Corporation failed to name a particular trust when it indorsed the Note to U.S. Bank. (Pl. Opp. Mem. at 13). In other words, the Smyths contend that by indorsing the Note to "U.S. Bank National Association as Trustee" without specifying a particular trust, Residential Funding Corporation undermined U.S. Bank's ability to enforce the Note in its capacity as Trustee for Residential Asset-Backed Pass-Through Certificates Series 2006-EMX1. (See id.). However, the Smyths have cited no authority, and this court has found none, to suggest that the indorsement of a promissory note to a trustee must identify the trust on behalf of which the trustee is acting. Rather, the available case law indicates that a trustee's status as the holder of a promissory note, with authority to enforce the note, is not defeated by the failure of the indorsement to specify a particular trust. See Galvin, 50 F. Supp. 3d at 80 (finding that the failure to specify the trust for which the trustee was acting when the note was indorsed had no effect on the validity or efficacy of the indorsement and did not destroy the trustee's status as the holder of the note). This is consistent with Massachusetts statutory law, which provides that "the holder of [an] instrument" is entitled to enforce the instrument, and that when an instrument has been made payable to a trustee, "the instrument is payable to the trustee . . . whether or not the beneficiary . . . is also named[.]" Mass. Gen. Laws ch. 106, §§ 3-

18

301, 3-110(c)(2).  Accordingly, this court finds that the Smyths' arguments are inadequate to avoid summary judgment.

### Plaintiffs' Challenge to U.S. Bank's Status as the Holder of the Mortgage

The plaintiffs also argue that U.S. Bank lacks the authority to foreclose on their property because it is not the rightful holder of the Mortgage.  Although the plaintiffs do not dispute that MERS assigned the Mortgage to "U.S. Bank, National Association, as Trustee for RASC 2006-EMX1" on August 3, 2011, they insist that the defendants must show that the assignment was authorized by the owner of the debt in order to establish its validity.  (Pl. Opp. Mem. at 14-15). Because there is no evidence showing who directed MERS to assign the Mortgage to U.S. Bank in August 2011, the plaintiffs contend that a genuine issue of fact exists regarding the validity of the assignment.  (See id.).

This court finds that the plaintiffs' argument on this matter lacks merit.  "[U]nder Massachusetts law, MERS may validly possess and transfer a legal interest in a mortgage." Serra v. Quantum Servicing, Corp., 747 F.3d 37, 40 (1st Cir. 2014).  Moreover, the Appeals Court of Massachusetts has expressly rejected the assertion that "any assignment by MERS to another entity is invalid unless supported by evidence of authorization of that assignment by the owner of the debt."  Sullivan v. Kondaur Capital Corp., 85 Mass. App. Ct. 202, 209, 7 N.E.3d 1113, 1118 (2014).  Where, as in this case, MERS is the mortgagee, it "retain[s] the right to assign the mortgage unilaterally absent any restriction in the mortgage document."  Shea v. Fed. Nat'l Mortg. Ass'n, 87 Mass. App. Ct. 901, 903, 31 N.E.3d 1122, 1125 (2015).  Here, the plaintiffs have presented no evidence of any such restriction. Therefore, the assignment was valid, and the plaintiffs' argument to the contrary must fail.

**C.** **Claim for Breach of Fiduciary Duty**

In Count III of their Complaint, the Smyths are seeking to hold Wells Fargo liable for breach of its fiduciary duties. Specifically, the plaintiffs allege that the defendant "breached the fiduciary duty by providing the Smyths with a less favorable in-house modification when they were eligible for a HAMP modification and then using the Smyths' acceptance of that modification against them later." (Compl. ¶ 79). The defendants argue that they are entitled to summary judgment on this claim because no such duty exists between a borrower and a lender. (Def. Mem. (Docket No. 39) at 8-9). This court agrees, and recommends that the defendants' motion be allowed with respect to Count III.

"Ordinarily, the mere relationship between mortgage holder or servicer and borrower does not give rise to a fiduciary duty to the latter." HMC Assets, LLC v. Conley, Civil Action No. 14-10321-MBB, 2016 WL 4443152, at *29 (D. Mass. Aug. 22, 2016) (slip op.) (internal quotation marks omitted), and cases cited. This rule has been adopted by the state courts of Massachusetts. See Santos v. U.S. Bank Nat'l Ass'n, 89 Mass. App. Ct. 687, 699-700, 54 N.E.3d 548, 559 (2016) (noting that "the clear trend of Federal courts applying State law is that neither HAMP nor the relationship between a borrower and her servicer/lender imposes any duty of care owed by lending banks and servicers to borrowers[,]" and concluding that "under Massachusetts law, HAMP does not impose a duty of care owed by lenders and servicers to borrowers"). An exception to the general rule exists insofar "as a mortgagee does owe a fiduciary duty to a mortgagor to refrain from committing fraud, bad faith or failing to use reasonable diligence in the context of a foreclosure sale." HMC Assets, LLC, 2016 WL 4443152, at *29 (internal quotation marks omitted), and cases cited. In the instant case, however, no foreclosure sale

20

has taken place.  Therefore, the plaintiffs cannot maintain a claim against Wells Fargo for breach of its fiduciary duties.[8]

### D.   Claim for Breach of the Implied Covenant of Good Faith & Fair Dealing

The defendants also have moved for summary judgment on the Smyths' claim for breach of the implied covenant of good faith and fair dealing.  By their claim, the Smyths allege that the defendants violated the implied covenant by failing to evaluate them for a HAMP modification in 2010; failing to provide them with the HAMP modification for which they were eligible; misrepresenting the nature of the 2010 modification; falsely stating that there were no alternatives to the 2010 modification; and refusing to give the Smyths a second modification after stringing them along for over a year and a half without telling them that the 2010 modification would render them ineligible for relief.  (See Compl. ¶ 84).  This court recommends that the defendants' motion be allowed with respect to this claim as well.

"Under Massachusetts law, every contract implies good faith and fair dealing between the parties to it."  Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013)

---

[8] The plaintiffs' reliance on Abraham v. Am. Home Mortg. Servicing, Inc., Civil Action No. 11-10854-JLT, 2012 WL 4482236 (D. Mass. Sept. 27, 2012), does not alter this court's conclusion that Wells Fargo had no fiduciary duty to the Smyths and is entitled to judgment as a matter of law with respect to Count III of the Complaint.  In Abraham, the court determined that "under Massachusetts law, the relationship between a lender and borrower, without more, does not establish a fiduciary relationship[,]" and it dismissed the plaintiff's claim that her mortgage servicer breached a fiduciary duty by scheduling a foreclosure before it evaluated her application for a loan modification.  Abraham, 2012 WL 4482236, at *3 (quoting FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 102 (1st Cir. 2009)).  Thus, Abraham is entirely consistent with this court's ruling in this case.  Furthermore, while the Abraham court found that a violation of the HAMP guidelines could support a claim for common law negligence, it has since been determined in the HAMP context that a loan servicer owes no legal duty to the borrower.  See MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 495 (1st Cir. 2013) (rejecting plaintiff's claim for negligence against loan servicer on the grounds that servicer owed borrower no duty of care); Santos, 89 Mass. App. Ct. at 700, 54 N.E.3d at 559 ("under Massachusetts law, HAMP does not impose a duty of care owed by lenders and services to borrowers").

(quotations, citation and punctuation omitted).  "The covenant of good faith and fair dealing

requires that 'neither party shall do anything that will have the effect of destroying or injuring

the right of the other party to the fruits of the contract.'"  Id. at 237-38 (quoting T.W.

Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 924 N.E.2d 696, 704 (2010)).  "Put another

way, the parties to a contract implicitly agree 'to deal honestly and in good faith in both the

performance and enforcement of the terms of their contract.'"  Biltcliffe v. CitiMortgage, Inc.,

952 F. Supp. 2d 371, 381 (D. Mass. 2013) (quoting Hawthorne's, Inc. v. Warrenton Realty, Inc.,

414 Mass. 200, 211, 606 N.E.2d 908 (1993)).  Thus, "the purpose of the covenant is to

guarantee that the parties remain faithful to the intended and agreed expectations of the

parties in their performance."  Id. (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441

Mass. 376, 385, 805 N.E.2d 957 (2004)) (alteration omitted).

      The defendants argue that the Smyths' claim for breach of the implied covenant of good

faith and fair dealing must fail because the plaintiffs' Mortgage contains no right to a loan

modification or even a right to be considered for a modification. (Def. Mem. at 8).  This court

agrees that the defendants' motion should be allowed on this basis.  "[T]he concept of good

faith is shaped by the nature of the contractual relationship from which the implied covenant

derives, and the scope of the covenant is only as broad as the contract that governs the particu-

lar relationship."  MacKenzie, 738 F.3d at 493 (quotations and citations omitted).  As a result,

"the implied covenant of good faith cannot create rights and duties not otherwise provided for

in the existing contractual relationship. Id. (quotations and citations omitted).  Here, the

Mortgage, as modified by the 2010 Loan Modification Agreement, is the only contract between

the Smyths and the defendants, and it is undisputed that the Mortgage imposed no duty upon

the mortgagee to modify or consider modifying the mortgage loan. (DF ¶ 11). "It would therefore be an error to extend the implied covenant to encompass a duty to modify (or consider modifying) the loan prior to foreclosure, where no such obligation exists in the mortgage." MacKenzie, 738 F.3d at 493.

In an effort to avoid summary judgment on this claim, the plaintiffs argue that the defendants "violated the covenant of good faith and fair dealing by breaching the oral contract established when Wells Fargo employees told Mr. Smyth that if he sent in his loan modification application he would be reviewed for a loan modification and would obtain one if he qualified." (Pl. Opp. Mem. at 4). However, an oral agreement to modify a mortgage is unenforceable as a matter of law. Under the Massachusetts Statute of Frauds, "[n]o action shall be brought . . . [u]pon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them . . . unless the . . . contract . . . upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." Mass. Gen. Laws ch. 259, § 1. "[A] contract affecting a mortgage falls squarely within the Statute." French v. Chase Bank, N.A., Civil Action No. 10-cv-11330-RGS, 2012 WL 273724, at *2 (D. Mass. Jan. 31, 2012), and cases cited. Because the Smyths cannot establish the existence of a contractual duty on the part of Wells Fargo to modify or consider modifying their mortgage loan, their claim for breach of the implied covenant of good faith and fair dealing cannot survive summary judgment.

### E.    Claims for Misrepresentation

The defendants next challenge the Smyths' claims for misrepresentation, by which the plaintiffs allege that the defendants engaged in intentional and negligent misrepresentation by

failing to inform the Smyths that the 2010 modification was not a HAMP modification; inducing

the Smyths to apply for a second modification in 2011, and telling them for more than a year

that they may be eligible for a new loan modification even though the defendants considered

the Smyths ineligible for relief due to their default on the first modification; and notifying the

Smyths in 2013 that they were not eligible for loss mitigation or workout options. (Compl.

¶¶ 89, 94). The defendants contend that to the extent these claims are based on alleged

misrepresentations regarding the 2010 loan modification, they are barred by the statute of

limitations. (Def. Mem. at 10-11). In addition, the defendants contend that they are entitled to

summary judgment with respect to the remaining statements because the plaintiffs have not

presented sufficient evidence to prove the elements of their claims. (Id. at 11, 15). For the

reasons that follow, this court finds that any misrepresentations that allegedly occurred in

connection with the 2010 modification are time-barred, but that the claims should otherwise

be decided by a jury.

### The Statute of Limitations

Massachusetts law provides that "actions of tort . . . shall be commenced only within

three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A. Conse-

quently, the plaintiffs' claims for intentional and negligent misrepresentation "are governed by

a three-year limitations period." See Salois v. Dime Sav. Bank of N.Y., FSB, 128 F.3d 20, 24 (1st

Cir. 1997). The record establishes that the Smyths filed their Complaint against Wells Fargo and

U.S. Bank in July 2014. (Pl. Opp. Mem. at 16). In order to avoid the statute of limitations,

therefore, their misrepresentation claims must have accrued no earlier than July 2011.

24

"A cause of action generally accrues at the time of the plaintiff's injury[.]" <u>Salois</u>, 128 F.3d at 25. With respect to the Smyths' 2010 loan modification, any alleged injury occurred on January 12, 2010, the date when the parties entered into the written Loan Modification Agreement. <u>See</u> <u>id.</u> ("plaintiffs' claims arose when [the lender] allegedly induced them to sign loan contracts by misrepresenting and/or omitting facts about the terms of the mortgage"). Because any misrepresentation claims based on the 2010 modification accrued outside the applicable limitations period, "the viability of [those] claims depends on whether principles of equitable tolling apply." <u>Id.</u> For the reasons that follow, this court finds that equitable tolling is inapplicable to the facts of this case.

In an effort to avoid summary judgment, the Smyths attempt to invoke the so-called "discovery rule." (Pl. Opp. Mem. at 16-17). That rule "provides that the limitations period is tolled until 'events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed.'" <u>Epstein v. C.R. Bard, Inc.</u>, 460 F.3d 183, 187 (1st Cir. 2006) (quoting <u>Felton v. Labor Relations Comm'n</u>, 33 Mass. App. Ct. 926, 598 N.E.2d 687, 689 (1992)). The Smyths contend that "[i]t was only after they received a denial based on the investor restriction in 2013 and got legal help that [they] became aware of the prior misrepresentations." (Pl. Opp. Mem. at 17). Therefore, they reason that their claims for misrepresentation arising out of the 2010 modification did not accrue until 2013. (<u>See</u> <u>id.</u>).

This court finds that the plaintiffs' argument is unpersuasive. "A plaintiff is considered to be on 'inquiry notice' when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." <u>Epstein</u>, 460 F.3d at 187. In the case of mortgage loan transactions, potential plaintiffs are on notice of fraud and other

25

misrepresentations at the time they sign the loan documents. See Salois, 128 F.3d at 26 ("even if [the lender] had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud." (quotations, punctuation and citation omitted)); Mantz v. Wells Fargo Bank, N.A., Civil Action No. 09-12010-JLT, 2011 WL 196915, at *6 (D. Mass. Jan. 19, 2011) ("In the context of mortgage loan transactions, the statute of limitations on fraud claims begins to run on the date of the closing, as potential plaintiffs are on notice for fraud when they sign the loan documents."). At that point, a borrower has all the information necessary to determine the nature and terms of the loan, and to raise questions regarding the lender's prior representations. In the instant case, the January 12, 2010 Loan Modification Agreement contained all of the information necessary to determine the details of the Smyths' modification and put them on inquiry notice regarding any misrepresentations. Therefore, their claims for misrepresentation relating to the 2010 modification are time-barred.

### Merits of Plaintiffs' Misrepresentation Claims

There is no dispute that the statute of limitations does not bar the plaintiffs' claims to the extent they are based on misrepresentations that allegedly occurred in connection with the Smyths' application for a second loan modification. Nevertheless, the defendants assert that the record does not support those claims on the merits. In order to prevail on a claim for intentional misrepresentation, the plaintiff "must establish that the defendant 'made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'" Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458, 772 N.E.2d 1054, 1066 (2002) (quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8, 429 N.E.2d

1129 (1982)) (additional citation omitted).  To prove a claim for negligent misrepresentation,

the plaintiff must establish that

> the defendant "(1) in the course of his business, (2) supplied false
> information for the guidance of others (3) in their business transactions,
> (4) causing and resulting in pecuniary loss to those others (5) by their
> justifiable reliance on the information, and that he (6) failed to exercise
> reasonable care or competence in obtaining or communicating the
> information."

Braunstein v. McCabe, 571 F.3d 108, 126 (1st Cir. 2009) (quoting Gossels v. Fleet Nat'l Bank,

453 Mass. 366, 377, 902 N.E.2d 370, 371-72 (2009)).  The defendants argue that the Smyths'

claim for intentional misrepresentation fails as a matter of law because the plaintiffs cannot

establish that Wells Fargo _knowingly_ made any false statements.  (Def. Mem. at 11).  They also

argue that the Smyths cannot prevail on their claims for intentional or negligent misrepresenta-

tion because they have not presented evidence showing that they suffered pecuniary loss as a

result of their reliance on the alleged misrepresentations.  This court disagrees, and recom-

mends that the motion for summary judgment on these claims be denied.

### Evidence of Wells Fargo's Knowledge

According to the Smyths, Wells Fargo engaged in intentional misrepresentation by

soliciting them to apply for a second loan modification, and encouraging them to pursue a

modification over the period from 2011 through 2013, even though it knew, as early as 2011,

that the Smyths would not qualify due to investor restrictions on capitalizing arrears in a second

modification.  (Pl. Opp. Mem. at 16-18).  The defendants contend that the Smyths cannot prove

that Wells Fargo acted with the requisite intent because the undisputed facts establish they had

no knowledge of Wells Fargo's internal workings.  (Def. Mem. at 11).

Although the record supports the defendants' assertion that the plaintiffs have no such knowledge (DF ¶ 43; Def. Ex. B at 77), this is not sufficient to defeat the Smyths' claim for intentional misrepresentation.  As an initial matter, there is no dispute that Wells Fargo was the servicer of the plaintiffs' mortgage loan throughout the relevant time period, and had been responsible for handling their first modification.  Accordingly, a jury could reasonably conclude that Wells Fargo knew or should have known about investor restrictions on the loan at the time the Smyths applied for a second modification.  In addition, the record contains documentary evidence supporting the Smyths' assertion that Wells Fargo knew about the restrictions as early as 2011, but failed to disclose that information to the plaintiffs until February of 2013.  As described above, Wells Fargo's internal records contain a note dated June 24, 2011, which concerns the plaintiffs' application for a second loan modification and reads in relevant part as follows: "BASED ON INV/BUS RULES, LOAN CANNOT BE CONSIDERED FOR OTHER OPTIONS IN ER. UNABLE TO RECOMMEND CREDIT COUNSELOR."  (Pl. Ex. R).  A reasonable jury could conclude from this evidence that Wells Fargo knew, as early as June 2011, that the Smyths would not qualify for a second loan modification, but that it continued to string them along for more than a year and a half before notifying them that investor restrictions precluded any relief.  The fact that the Smyths had no knowledge of Wells Fargo's inner workings does nothing to undermine this conclusion.

The defendants suggest that the plaintiffs have misinterpreted Wells Fargo's records. (DR ¶ 46).  According to the defendants, the June 2011 note on which the Smyths have relied shows that "Wells Fargo was aware that investor restrictions prevents a repayment loan, which allows the mortgagor to catch up on past payments," but "does not indicate that the loan was

no[t] eligible for a loan modification due to investor restrictions." (Id.). However, the defen-

dants have not submitted any testimony to support their position. Moreover, the note's

reference to "other options" suggests that it was addressing not only a possible loan repay-

ment, but also the potential for other relief as well.[9]  Accordingly, this court recommends that

the question of Wells' Fargo's knowledge be resolved by a finder of fact at trial.

### Damages

    This court also finds that while the question is a close one, a genuine dispute exists as to

whether the plaintiffs sustained losses as a result of the alleged misrepresentations.  To the

extent the Smyths are claiming damages resulting from the 2010 loan modification, any such

claims are time-barred for the reasons described above.  Even if those claims were not barred,

the Smyths would not be entitled to recover for any payments they made pursuant to the 2010

Loan Modification Agreement.  See Brown v. Bank of Am. Nat'l Ass'n, 67 F. Supp. 3d 508, 519

(D. Mass. 2014) (explaining that "[l]oss of mortgage payments alone does not satisfy the harm

requirement [of a misrepresentation claim] because the money was already due on the

mortgage agreement.").  Nevertheless, the plaintiffs have presented an Affidavit from Mr.

Smyth in which he testified that he lost work and wages as a result of time that he spent

working on the second application for a loan modification. (Pl. Ex. C ¶ 17).  He also testified

that he and his wife incurred various out-of-pocket costs in connection with the completion of

---

[9] Wells Fargo's records contain a separate note dated June 24, 2011, which reads: "REPAY NOT FEAS BASED ON INV/BUS GUIDELINES." (Pl. Ex. R).  While this second note supports the defendants' assertion that Wells Fargo determined that a repayment option was not feasible with respect to the Smyths' mortgage loan, it is not clear how it relates to the prior note regarding the Smyths' ineligibility for "other options."  Thus, questions regarding the interpretation of the defendant's internal records, including what those records show about Wells Fargo's knowledge of investor restrictions on the plaintiffs' loan, should be submitted to a jury.

that application, including costs associated with obtaining records, faxing documents, and mailing materials to the defendants. (Id. ¶ 18). This court finds that this is enough to create a genuine issue of material fact as to whether the Smyths suffered pecuniary loss as a result of Well Fargo's conduct in encouraging them to apply for relief that they had no prospect of obtaining.

The defendants assert that Mr. Smyth's Affidavit testimony on these matters is inadmissible because his statements concerning his alleged losses contradict his prior sworn deposition testimony. (See Def. Reply Mem. (Docket No. 53) at 9-11). As the defendants argue:

> During his deposition, Mr. Smyth testified that he turned down work assignments for "various lenders and appraisal management companies" because the assignment "was in an area that [he did not] have geographic competence" or if it was for a property that was "outside [his] field of expertise." Defendants' counsel then asked if there was "any other reason why [Mr. Smyth] would turn down an assignment" and Mr. Smyth responded with an unequivocal "No." Furthermore, Mr. Smyth testified that in 2012 he worked for Title Service, Inc. as a staff appraiser where he earned a salary of approximately $40,000.00, plus incentives. Mr. Smyth "never understood exactly how the incentives were calculated" and stated that from 2012 to the present his "incentive" payment "never fluctuated that much."
>
> Mr. Smyth now contradicts this testimony in a post-summary judgment affidavit. He claims that he was self-employed and suffered damages in the form of ... lost wages because he did not "seek out jobs" due to the time spent pursuing the loan modification. This clearly contradicts his testimony that he was a salaried employee, that work was assigned to him, and he had the option to refuse an assignment.

(Id. at 9-10 (internal citations omitted)). The defendants further contend that Mr. Smyth's statement regarding the costs he incurred in connection with his application for a second loan modification is contradicted by his prior sworn deposition, in which he indicated that he had no documentary proof of his copying costs. (See DR ¶ 42). Because Mr. Smyth has proffered no

explanation for the alleged change in his testimony, Wells Fargo and U.S. Bank urge this court

to disregard the challenged portions of his Affidavit.  For the reasons that follow, this court

declines to do so.

"It is well-established that 'a party opposing summary judgment may not manufacture a

dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation

of why the testimony is changed.'"  Hofer v. Gap, Inc., 516 F. Supp. 2d 161, 169 (D. Mass. 2007)

(quoting Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001)).  However, this does not mean

that a party opposing summary judgment is precluded from presenting additional testimony

relating to topics covered in a prior deposition.  An affiant is entitled to clarify or augment prior

testimony without running afoul of the "sham affidavit rule."  Mahan v. Boston Water & Sewer

Comm'n, 179 F.R.D. 49, 53-56 (D. Mass. 1998).  Therefore, an "affidavit should be stricken only

if there is a clear and unambiguous contradiction between the affidavit and the prior sworn

testimony."  Hofer, 516 F. Supp. 2d at 169.  "A subsequent affidavit that merely explains, or

amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in

opposition to a motion for summary judgment."  Id. (quoting Gillen v. Fallon Ambulance Serv.,

Inc., 283 F.3d 11, 26 (1st Cir. 2002)).

The record in the instant case does not establish the existence of a direct conflict

between Mr. Smyth's Affidavit and his prior sworn deposition testimony.  As an initial matter,

Mr. Smyth did not testify, as the defendants assert, that he had no proof of his copying costs.

Instead, during his deposition, Mr. Smyth stated that the costs associated with the plaintiffs'

HAMP application "are probably not well documented." (Def. Ex. B at 90).  Mr. Smyth did not

indicate that he had no records of his costs, or that he would not be able to quantify at least

some of those expenses. (See id.). Accordingly, there is nothing inconsistent between his

deposition testimony and his Affidavit, in which Mr. Smyth stated that the plaintiffs "gave the

Defendants some proofs of our costs in discovery like costs of faxing and mailings." (Pl. Ex. C

¶ 18).

   This court also finds that Mr. Smyth's statements regarding his loss of work and wages

are not clearly inconsistent with his prior deposition testimony.  During his deposition, Mr.

Smyth explained that he was self-employed as an appraiser prior to 2012, and that in January

2012, he began working as a staff appraiser for Title Service, Inc. ("TSI"), where he received a

base salary of $40,000 plus incentives based on how much work he was able to produce. (Def.

Ex. B at 13-18).  Mr. Smyth was unable to explain how the incentives were calculated while he

was at TSI, but he stated that they "worked out to about $12,000 the first year [he] was there

and never really fluctuated too much from that." (Id. at 18).  He also testified that during the

time period between 2010 and 2012, when he was self-employed, he would turn down

assignments if he lacked the "geographic competence" or expertise to perform the work, but

that there were no other reasons why he would "turn down an assignment." (Id. at 90).

   Mr. Smyth's Affidavit does not contradict these statements.  In his Affidavit, Mr. Smyth

claimed that he

> lost work and wages from spending lots of time on the loan modification
> application between 2011 and 2013 because [he] *did not seek out jobs*
> because [he] knew [he] did not have time to do them ... because so much
> time had to be spen[t] on the loan modification application.

(Pl. Ex. C. ¶ 17 (emphasis added)).  There is nothing clearly inconsistent between this statement

and Mr. Smyth's prior testimony, in which the plaintiff explained that his decision to turn down

specific assignments was unrelated to his effort to obtain a HAMP modification.  Furthermore,

Mr. Smyth does not claim that he was self-employed throughout the time period from 2011 to 2013. While the defendants are free to question Mr. Smyth at trial regarding the extent to which he actually sought out work after he became an employee of TSI, and why his incentive payment did not fluctuate during his employment there, they have not shown that there is a clear and unambiguous contradiction between the Affidavit and Mr. Smyth's earlier deposition testimony. Therefore, it would not be appropriate for this court to disregard the challenged portions of the plaintiff's Affidavit, and the question of damages should be submitted to a jury.

### F.   Claim for Violations of Chapter 93A

Finally, U.S. Bank and Wells Fargo have moved for summary judgment on the plaintiffs' claim that the defendants violated the Massachusetts Consumer Protection statute known as Chapter 93A. By their claim, the Smyths allege that the defendants engaged in unfair and deceptive conduct by providing them with a non-HAMP loan modification in 2010; refusing to grant the Smyths a second modification based on their acceptance of the 2010 modification; misrepresenting the Smyths' ability to obtain a second modification; and failing to comply with the HAMP program. (Compl. ¶¶ 62, 63). They also allege that the defendants' actions in connection with the 2010 modification violated a number of regulations that have been promulgated under Chapter 93A. (Id. ¶ 63). The defendants contend that this claim must fail as a matter of law because the statute of limitations bars the Smyths' claim that the defendants engaged in unfair or deceptive conduct in connection with the 2010 loan modification, the plaintiffs have failed to identify any unfair or deceptive conduct on the part of the defendants, and the record fails to establish that the plaintiffs suffered harm as a result of the defendants' alleged conduct. While this court finds that the statute of limitations precludes the plaintiffs

33

from pursuing a Chapter 93A claim to the extent it is based on the 2010 loan modification, it recommends that the motion for summary judgment on their Chapter 93A claim otherwise be denied.

### Statute of Limitations

Claims brought under Chapter 93A "shall be commenced only within four years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 5A. "The general rule is that a cause of action under Chapter 93A accrues 'when the plaintiff knew or should have known of the appreciable harm resulting from the defendant's actions.'" George v. Stonebridge Mortg. Co., LLC, 988 F. Supp. 2d 142, 150 (D. Mass. 2013) (quoting Schwartz v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 678, 740 N.E.2d 1039 (2001)) (punctuation omitted). Where, as in this case, the alleged violation involves the issuance of a loan, the limitations period "begins to accrue from the moment the parties entered the loan." Id. at 151 (quoting Da Silva v. U.S. Bank, N.A., 885 F. Supp. 2d 500, 504 (D. Mass. 2012)).

As described above, the Smyths entered into the 2010 Loan Modification Agreement with Wells Fargo on January 12, 2010. (Def. Ex. K). Consequently, any claim challenging the modification under Chapter 93A needed to be brought by January 12, 2014. As further described above, the Smyths did not file the instant litigation until July 2014. (Pl. Opp. Mem. at 16). To the extent their Chapter 93A claim arises out of the 2010 loan modification, it is barred by the applicable statute of limitations.

### Evidence of Unfair or Deceptive Conduct

With respect to the plaintiffs' claim that the defendants violated Chapter 93A in connection with their application for a second loan modification, the defendants contend that

the claim must fail because there is no evidence that they engaged in unfair or deceptive

conduct. (Def. Mem. at 13-14). This court finds that when the evidence is viewed in the light

most favorable to the plaintiffs, it supports their claim that the defendants' conduct was

unlawful under Chapter 93A. Therefore, the defendants have not shown that they are entitled

to summary judgment on this basis.

"Chapter 93A prohibits 'unfair or deceptive acts or practices in the conduct of any trade

or commerce.'" Morris v. BAC Home Loans Servicing, L.P., 775 F. Supp. 2d 255, 258-59 (D.

Mass. 2011) (quoting Mass. Gen. Laws ch. 93A, § 2). "To prevail on a Chapter 93A claim, the

plaintiff 'must prove that a person who is engaged in trade or business committed an unfair or

deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a

result.'" Id. at 259 (quoting Brandon Assocs., LLC v. FailSafe Air Safety Sys. Corp., 384 F. Supp.

2d 442, 446 (D. Mass. 2005)) (alteration in original). "'A practice is unfair if it is within the

penumbra of some common-law, statutory, or other established concept of unfairness; is

immoral, unethical, oppressive, or unscrupulous; and causes substantial injury.'" Charest v.

Fed. Nat'l Mortg. Ass'n, 9 F. Supp. 3d 114, 124 (D. Mass. 2014) (quoting Young v. Wells Fargo

Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013)) (additional quotations and citation omitted). "A

practice is deceptive 'if it could reasonably be found to have caused a person to act differently

from the way he or she otherwise would have acted.'" Id. (quoting Aspinall v. Philip Morris

Cos., Inc., 442 Mass. 381, 394, 813 N.E.2d 476, 486 (2004)) (additional quotations omitted). In

the HAMP context, evidence that "defendants misrepresented to plaintiffs the status of their

HAMP application, their rights under HAMP, or their eligibility for a permanent loan modifica-

tion; misrepresented to plaintiffs the likelihood or imminency of foreclosure; or actually

conducted a foreclosure sale in violation of HAMP guidelines" may be sufficiently unfair or deceptive to support a claim under Chapter 93A. Markle v. HSBC Mortg. Corp., 844 F. Supp. 2d 172, 186 (D. Mass. 2011). Nevertheless, the defendant's conduct must be "egregious" to fall within the scope of the statute. See Baker v. Goldman Sachs & Co., 771 F.3d 37, 51-52 (1st Cir. 2014). "'[M]ere negligence,' standing alone, is not sufficient for a violation of ch. 93A[.]" Id. at 51 (quoting, e.g., Klairmont v. Gainsboro Rest., Inc., 465 Mass. 165, 176, 987 N.E.2d 1247, 1257 (2013) (additional citations omitted)).

The Smyths have presented adequate facts to support their claim that the defendants engaged in unfair or deceptive conduct. In particular, the Smyths have submitted evidence showing that Wells Fargo repeatedly solicited them to apply for a HAMP modification, consistently encouraged them to complete their application throughout the period from 2011 to 2013, and repeatedly assured them that they would receive a HAMP modification if they qualified following a review of their application, without disclosing the fact that investor restrictions rendered the Smyths ineligible for a modification from the start. Representations such as these "have been found sufficiently unfair or deceptive" to support a claim under Chapter 93A.[10] See Markle, 844 F. Supp. 2d at 186 (misrepresentations regarding a plaintiff's eligibility for a permanent loan modification provide evidence of unfair or deceptive practices for purposes of Chapter 93A); Bosque v. Wells Fargo Bank, N.A., 762 F. Supp.2d 342, 353-54 (D.

---

[10] The defendants argue that it is not unfair or deceptive to deny a HAMP application on the grounds of investor restrictions. (Def. Mem. at 13). This argument misreads the nature of the plaintiffs' claim. The plaintiffs do not contend that the defendants violated Chapter 93A simply by denying their application based on the existence of an investor restriction. Rather, they argue that it was unlawful for the defendants to mislead them into believing that they could qualify for a loan modification without informing them that investor restrictions precluded such relief.

Mass. 2011) (same). According to Mr. Smyth, the lengthy process of completing the application required a significant amount of time and effort on his part, which interfered with his ability to seek out appraisal work, and involved a variety of out-of-pocket costs. (See PF ¶ 7; DR ¶ 7; Pl. Ex. C ¶¶ 17-21). A factfinder could reasonably conclude from this evidence that Mr. Smyth would not have pursued the application if he had known about the investor restrictions on his ability to obtain a HAMP modification, and that he was deceived by the defendants' failure to disclose this information.[11] See Okoye v. Bank of NY Mellon, Civil Action No. 10-11563-DPW, 2011 WL 3269686, at *6 (D. Mass. July 28, 2011) (explaining that "[c]onduct is 'deceptive'" within the meaning of Chapter 93A "when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." (quotations and citation omitted)). Accordingly, these facts provide further support for the Smyths' claim that Wells Fargo engaged in unfair or deceptive conduct.

The plaintiffs argue that Wells Fargo also engaged in unfair or deceptive conduct by failing to request a waiver of the investor restrictions on the Smyths' ability to obtain a second loan modification. (Pl. Opp. Mem. at 8-12). Specifically, the Smyths note that under the HAMP guidelines, Wells Fargo was required to use "reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out any modification under the HAMP." (Id. at 9). They further argue that despite repeated requests, the

---

[11] There is no merit to the Smyths' assertion that it was unfair or deceptive for the defendants to accelerate the Note and take steps to foreclose on their property. (See Pl. Opp. Mem. at 12-15). The plaintiffs' argument is premised upon their contention that U.S. Bank is not the proper holder of the Note and the Mortgage, and that the defendants lack authority to carry out a foreclosure. As described above, the defendants have presented evidence, which is not genuinely disputed, to show that U.S. Bank holds both the Note and the Mortgage, and that it has standing to carry out the foreclosure of the plaintiffs' property.

defendants have failed to produce any evidence to show that Wells Fargo sought a waiver of the investor restrictions in this case. (See id. at 11-12). Finally, the plaintiffs reason that it was unfair and deceptive for Wells Fargo not to request a waiver because "[d]ocumenting efforts to have the investor waive restrictions on a HAMP modification is a necessary part of the good faith effort to evaluate a borrower for a HAMP." (Id.). As described below, violations of the HAMP guidelines are insufficient to support a claim under Chapter 93A unless the plaintiff can show that the defendant's violations were unfair or deceptive within the meaning of the statute. This court finds that the record is sufficient to create a genuine issue of fact as to whether Wells Fargo's failure to seek a waiver in this case was unfair or deceptive for purposes of Chapter 93A.

Pursuant to the HAMP guidelines, servicers are required to use "reasonable efforts" to seek a waiver of any restrictions that interfere with their ability to complete a loan modification. See Pacheco v. PNC Bank, N.A., No. 14-P-1488, 2015 WL 7019045, at *2 (Mass. App. Ct. Nov. 13, 2015) (noting that "HAMP guidelines required [mortgage loan servicer] to use 'reasonable efforts' to obtain a waiver of any requirement that prevented it from performing the obligations imposed by HAMP"); U.S. Bank Nat'l Ass'n v. Vasquez, 10 N.Y.S.3d 386, 388, 47 Misc.3d 1023, 1025 (2015) (slip. op.) (finding that plaintiff, U.S. Bank, "failed to demonstrate that it followed HAMP regulations and guidelines" where it failed to show that it sought a waiver of an investor restriction on its ability to provide a HAMP modification). The defendants in this case have not identified any documents showing that they requested a waiver of the investor restrictions that prevented Wells Fargo from providing the Smyths with a HAMP modification, despite being asked to do so. (See Pl. Ex. H ¶ 5; Def. Ex. D ¶¶ 7-8). Accordingly,

the undisputed facts indicate that they have failed to comply with their obligations under the HAMP guidelines.

In order to establish a violation of Chapter 93A, "the plaintiffs must [prove] more than that the HAMP guidelines were violated[.]" Morris, 775 F. Supp.2d at 262. They also must show that the defendants' actions in failing to comply with HAMP "were unfair or deceptive." Id. See also Pacheco, 2015 WL 7019045, at *3 ("The HAMP violation itself is insufficient to support the G.L. c. 93A claim absent a showing that it was committed in an unfair or deceptive manner."). Here, the defendants' failure to seek a waiver, even though they knew or should have known about the investor restrictions on the plaintiffs' loan at the start of the application process, not only violated the HAMP guidelines but also guaranteed that the plaintiffs' efforts to secure a HAMP modification would prove to be a useless exercise. Under such circum-stances, the question whether the defendants' failure to comply with HAMP also constituted unfair and deceptive conduct within the meaning of Chapter 93A should be determined at trial.

### Damages Under Chapter 93A

"[A] plaintiff bringing an action under c. 93A, § 9, must allege and ultimately prove that she [or he] has . . . suffered a *distinct* injury or harm that arises from the claimed unfair or deceptive act." Walsh v. TelTech Sys., Inc., 821 F.3d 155, 161 (1st Cir. 2016) (quoting Tyler v. Michaels Stores, Inc., 464 Mass. 492, 984 N.E.2d 737, 745 (2013)) (punctuation omitted). The defendants argue that the Smyths cannot satisfy this requirement because they "have not, and cannot, show that Wells Fargo's conduct caused them economic injury or emotional harm." (Def. Mem. at 15). This court finds that there are genuine questions of fact on this issue. As described above, the Smyths have presented sufficient evidence to show that they suffered

monetary harm as a result of the defendants' conduct, including lost wages and costs associated with perfecting their HAMP application.  This is enough to support their claim under Chapter 93A.[12]  See Brown, 67 F. Supp. 3d at 515 (finding that plaintiff stated a claim under Chapter 93A where he alleged that the defendant's misrepresentations and delays in responding to his attempts to obtain a loan modification caused him to incur additional fees and costs among other losses).  Accordingly, this court recommends that the motion for summary judgment be denied with respect to this claim.

## IV.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the "Defendants' Motion for Summary Judgment" (Docket No. 38) be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that the motion be allowed with respect to the Smyths' claims for lack of standing to foreclose, breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing, but denied with respect to their claims for misrepresentation and violation of Chapter 93A.[13]

---

[12] The plaintiffs have indicated that they intend to present evidence at trial linking the defendants' conduct to Mrs. Smyth's emotional distress. (Pl. Opp. Mem. at 19; see also PF ¶¶ 38-39).  This court recognizes "that Chapter 93A permits recovery for 'a personal injury loss such as emotional distress, even if the consumer lost no money or property.'"  Brown, 67 F. Supp. 3d at 514 (quoting Hershenow v. Enter. Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 840 N.E.2d 526, 533 (2006)).  However, a promise to proffer evidence at trial is inadequate to raise an issue of fact for purposes of defeating a motion for summary judgment.  See Samia Cos. LLC v. MRI Software LLC, 53 F. Supp. 3d 385, 393 (D. Mass. 2014) ("A promise to proffer evidence at trial is ... inadequate to avoid summary judgment").  Therefore, this court has not considered the plaintiffs' claim that Mrs. Smyth suffered emotional distress in connection with its analysis of the motion for summary judgment.

[13] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).